**Donald L. RIDGWAY, et al., Plaintiffs,**

v.

**Edward C. ALDRIGE, Jr., as Secretary of the Air Force, Defendant.**

**Civ. A. No. 88–0016–F.**

United States District Court,
D. Massachusetts.

March 29, 1989.

Terry Scott Nagel, Springfield, Mass., for plaintiffs.

Leila R. Kern, Asst. U.S. Atty., J.W. McCormack, Boston, Mass., for defendant.

## ORDER

FREEDMAN, Chief Judge.

This case is before the Court on the Magistrate's Report and Recommendation which was entered on March 9, 1989. It was the recommendation of the Magistrate that the defendant's motion to dismiss, treated as a motion for summary judgment, be allowed.

No objection to the Magistrate's recommendation having been filed, it is hereby ordered that it be adopted. The defendant's motion to dismiss, treated as a motion for summary judgment, is hereby allowed. The Clerk shall enter judgment for the defendant.

It is so ordered.

## REPORT AND RECOMMENDATION REGARDING DEFENDANT'S MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT[1]

MICHAEL A. PONSOR, United States Magistrate.

### I. INTRODUCTION.

Plaintiff Donald L. Ridgway, a former member of the Air Force Reserve and a former civilian Air Reserve Technician ("ART"), has brought this action against the Secretary of the Air Force charging discrimination based upon age under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634.[2] In summary, plaintiff alleges that his termination as a civilian military technician following his mandatory retirement as an Air Force Reserve officer constituted an act of discrimination based upon age. His wife, Esther P. Ridgway, has joined him as a plaintiff in her capacity as a potential survivor to her husband's retirement benefits. Unless otherwise indicated, the court will refer to plaintiff in the singular, meaning Donald L. Ridgway.

The defendant has moved for a dismissal of the complaint pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted.[3] A motion to dismiss which asserts "matters outside the pleading ... not excluded by the court" must be treated as one for summary judgment.

Defendant's motion presents two threshold barriers to plaintiff's lawsuit. First, he asserts that the decision to terminate the plaintiff from his civilian ART position was within the sphere of military discretion, not

1. This matter has been referred to the court for report and recommendation pursuant to Rule 3 of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, 28 U.S.C. § 636(b)(1)(B).

2. The provisions of the ADEA involved here were enacted as part of the Fair Labor Standards Amendment of 1974, which extended coverage under the ADEA to federal employees.

Pub.L. No. 93–259 § 28(b)(2), 88 stat. 74 (1974) (codified as amended at 29 U.S.C. § 633a).

3. The motion to dismiss also cites Fed.R.Civ.P. 12(b)(2), lack of personal jurisdiction, but no argument is offered on this point. Presumably, defendant meant to assert lack of subject matter jurisdiction, Fed.R.Civ.P. 12(b)(1).

subject to the ADEA. Second, he asserts that even if the ADEA applies, plaintiff cannot, as a matter of law, show that he was "qualified" to perform his task and is therefore unable to present a *prima facie* case.

Plaintiff has moved along two avenues to oppose the motion. First, he disputes the defendant's legal position substantively. Second, he asserts, under Fed.R.Civ.P. 56(f), that he must be given an adequate opportunity to take discovery on the points raised by the defendant's motion prior to any ruling.

Because this court is persuaded that the defendant's position is correct as a matter of law on both points, and that no conceivable discovery that plaintiff could take would alter this conclusion, it will recommend that the defendant's motion to dismiss, treated as one for summary judgment, be allowed.

## II. FACTUAL BACKGROUND.

### A. The "ART" Program.

The ART program was created as the result of a 1957 Memorandum of Agreement, implemented in 1958, between the Air Force and the Civil Service Commission, now the Office of Personnel Management ("OPM"). The agreement created a new type of hybrid civil service employee. First, the ART is a military reservist who occupies a military rank in a specific reserve unit and who may be activated during a time of crisis or other necessity. Second, the ART is a civilian technician who performs essentially the same military duties during his or her civilian work week. The beauty of the arrangement is that the military, in this case the Air Force, possesses a highly qualified civilian employee who, because of his reserve status, can be rapidly transformed into an active military officer to meet a threat to national security.

Since the inception of the ART program, the Air Force has had to contend with the problems of "status quo" employees. A status quo employee is one who occupies a civilian ART position but who, through physical disability or, more often, mandato-ry retirement, becomes ineligible for membership in the reserves. Units having such status quo personnel in key positions might find themselves forced to leave behind critical team members no longer eligible for military service in the event of a call-up. Civilian ARTs include such positions as base commanders, pilots, navigators and flight instructors. *See* Declaration of Troy C. Gay (Exhibit 3), ¶ 9.

In an attempt to remedy the status quo problem, the Air Force renegotiated its agreement with the OPM in 1979. The revised agreement permitted the Air Force Reserve to establish, as a precondition to employment, that an ART occupying an officer position agree to reassignment to any comparable ART or non-ART position if he lost his eligibility for reserve officer status.

Apparently, after this revision some problem lingered. Therefore, effective September 1, 1983 the Air Force and the OPM negotiated a new personnel regulation to the effect that ARTs holding designated "key positions" who lost their eligibility to participate in the Air Force Reserve would be offered placement assistance through the Department of Defense Priority Placement Program ("PPP") to other less critical positions. This program would attempt for a period of one year to place status quo civilian ARTs who occupied key positions into some other ART or non-ART position not designated as key. If the program was unable to do this after one year, or if the status quo civilian ART declined the proposed placement(s) throughout the year, the ART would be discharged.

As will be seen below, the effect of this regulation was a significant hardship on certain highly-placed Air Force civilian personnel. These employees would, under the procedures set forth, often be placed in a position of having to accept what amounted to a mandatory transfer, sometimes to a distant location and often far along in their professional careers, or face discharge.

Perhaps in recognition of this difficulty, Congress has recently amended its approach again. Congress has authorized the

Secretary of the Air Force to retain reserve officers who occupy civilian ART positions in active service beyond the mandatory retirement date called for in 10 U.S.C. § 8848(a) until the reserve officer is eligible to retire from his civil service ART position with full pension rights.[4] The new policy would solve the difficulty faced by the plaintiff here, except that it came too late to apply to this case. *See* Administrative Record (Exhibit 4), p. 80. The issues raised by the this litigation, therefore, are pertinent only to a limited group of potential plaintiffs occupying a particular temporal window.

### B. *Plaintiff's Background.*

Previous to August of 1983, the plaintiff, a Lieutenant Colonel in the Air Force Reserve, was employed as a civilian ART in the position of Wing Safety Chief and Pilot, Civil Service Classification Flight Instructor (Fixed Wing) GM–2181–13 by the 439th Tactical Airlift Wing at Westover Air Force Base, Massachusetts. Given his rank of Lieutenant Colonel, plaintiff was statutorily prohibited from serving more than 28 years in the active reserve. *See* 10 U.S.C. § 8848(a). In August of 1983, therefore, plaintiff, upon his mandatory military retirement, became a status quo civilian ART, no longer available to his unit for mobilization or deployment as an active duty officer.

In accordance with the agreement then in effect between the Air Force and the OPM, as set forth above, plaintiff was registered in the PPP effective September 1983. During the following year, plaintiff was offered four alternative positions by the PPP, which he declined. All four of the positions were geographically remote from Westover Air Force Base. Three were GS–11 positions and the other a GS–12. Applicable policies at the time insured that plaintiff would have suffered no loss of pay and would have been reimbursed for his relocation expenses. *See* Declaration of Pierce D. Turner (Exhibit 1), ¶ 6. Thus, it would appear the transfer would have generated no financial loss for the plaintiff. After the requisite year in the PPP, plaintiff's civilian employment was terminated[5] and this lawsuit for age discrimination was thereafter filed. There is no allegation by defendant that plaintiff, except for his lack of reserve status, was incompetent to do his job.

### III. DISCUSSION.

It is undisputed that, in general, the ADEA is applicable to some extent, to the military departments. In 1974, Congress explicitly amended the ADEA to state: "[a]ll personnel actions affecting employees ... in the military department ... shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). Military departments include the Department of the Air Force. 5 U.S.C. § 102.

Although the ADEA applies to military *employees*, the courts have been unwilling to extend the ADEA to protect uniformed personnel, whether active or reserve, in the armed forces. *See Kawitt v. United States*, 842 F.2d 951, 953 (7th Cir.1988). Similarly, courts have held that Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, amended to include the identical "military departments" coverage, is inapplicable to the military's uniformed personnel. *See Helm v. State of California*, 722 F.2d 507, 509 (9th Cir.1983); *Gonzalez v. Department of the Army*, 718 F.2d 926, 928 (9th Cir.1983); *Johnson v. Alexander*, 572 F.2d 1219, 1223–24 (8th Cir.1978), *cert. denied*, 439 U.S. 986, 99 S.Ct. 579, 58 L.Ed.2d 658 (1978). *But see Hill v. Berkman*, 635 F.Supp. 1228, 1233 (E.D.N.Y.1986) (held that Title VII is applicable to the uniformed military but noted "case law has consistently held to the contrary...."); *Hunter v. Stetson*, 444

---

4. Congress originally enacted this legislation as a temporary measure by Pub.L. No. 98–473, § 8106, 98 Stat. 1943 (1984). The legislation was made permanent by Pub.L. No. 99–145, § 522(b), 99 Stat. 632, 740 (1985) (codified as amended at 10 U.S.C. § 8848(c)).

5. The plaintiff, however, apparently obtained discontinued service retirement, and therefore did not completely lose his retirement benefits. *See* Defendant's Brief In Support of Motion to Dismiss, p. 9.

F.Supp. 238, 239–40 (E.D.N.Y.1977) (held that military, on the facts of that case, acted as a civilian employer.)

Plaintiff's position is that he does *not* complain of his mandatory retirement from the military, but does claim that he was wrongfully terminated from his *civilian* job pursuant to an arbitrary regulation negotiated between the Air Force and the OPM, and that, but for his age, the termination from his civilian employment would not have taken place.

Defendant responds that, while the ADEA may apply generally to the military departments, certain internal military decisions, such as the one at issue here, even when they affect civilian employees, are not subject to scrutiny under the ADEA. In other words, this case presents, according to defendant, "a non-justiciable military matter." *Penagaricano v. Llenza,* 747 F.2d 55, 59 (1st Cir.1984). This court agrees.[6]

Courts have been hesitant to intrude "into the area broadly confided by the Constitution to the President as commander-in-chief and his authorized subordinates." *Cortright v. Resor,* 447 F.2d 245, 246 (2nd Cir.1971), *cert. denied sub nom., Cortright v. Froehlke,* 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972). To put it more bluntly, "judges are not given the task of running the Army." *Orloff v. Willoughby,* 345 U.S. 83, 93, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953).

Despite this general prohibition, there is a limited range of circumstances in which a federal court may be permitted to review an internal military decision. *Mindes v. Seaman,* 453 F.2d 197 (5th Cir.1971) (federal courts may review internal military actions on their merits to determine if an official has acted beyond the scope of his statutory and regulatory authority).

The First Circuit has adopted the approach to military decision-making set forth by the Fifth Circuit in *Mindes.* The Fifth Circuit articulated a two-part threshold prerequisite and a four-part balancing test to determine whether the federal

courts should exercise their powers to review an internal military action. *See Naves v. Gonzalez Vales,* 752 F.2d 765 (1st Cir.1985); *Penagaricano v. Llenza,* 747 F.2d 55 (1st Cir.1984). *Penagaricano* applied the *Mindes* paradigm to a case virtually identical to plaintiff's here, where a National Guard officer lost both his military position and employment as a civilian technician.

Under *Mindes,* before claims involving internal military affairs are reviewable, plaintiff must allege a violation of the Constitution, statute or military regulation, and the plaintiff must demonstrate that he has exhausted available intraservice remedies. *Penagaricano,* 747 F.2d at 60 (*quoting Mindes,* 453 F.2d at 201). If these prerequisites are fulfilled, "the court must then weigh four factors to determine the advisability of review: (1) the nature and strength of the plaintiff's claim; (2) the potential injury to the plaintiff if review is denied; (3) the type and degree of interference with the military function; (4) the extent to which military expertise or discretion is involved." *Naves,* 752 F.2d at 769. The last two factors will be weighed most heavily. *Penagaricano,* 747 F.2d at 63.

Although the *Mindes* and *Penagaricano* decisions sprang from complaints alleging constitutional violations, the analysis is relevant in an ADEA context where the same concern for the proper balance between the federal court and the military may affect the decision regarding justiciability. *See Naves,* 752 F.2d at 769 (the court found non-justiciable the claim that the Selective Retention Board violated military regulations at the threshold phase of the *Mindes* test, and thus did not reach the balancing factors phase of the test). *See also e.g., Hill v. Berkman,* 635 F.Supp. 1228, 1240–41 (E.D.N.Y.1986) (application of the test articulated in *Mindes* to an action brought under Title VII). "Whatever the jurisdictional basis of an action may be, the need for considerable deference to military requirements remains constant." *Id.* at 1241.

---

**6.** In fact, *Penagaricano,* which involved loss of both a civilian and National Guard position, and

which was not cited by either party, is probably fatal to plaintiff's claim, standing alone.

In the instant case, the plaintiff has satisfied the initial *Mindes* threshold requisite by alleging an ADEA violation. Furthermore, defendant does not allege that the plaintiff failed to exhaust the administrative remedies available to him. The balance of *Mindes'* four factors, however, swing in the defendant's favor for non-justiciability.[7]

The first factor, the nature and strength of plaintiff's claim, certainly does not favor plaintiff. His claim is weak. The regulation which led to plaintiff's mandatory retirement and the loss of his civilian position was a rational and well-focused approach to a peculiarly military problem. Courts have recognized that the ART program was designed to increase the mobilization and deployment efficiency of the Air Force Reserve units. *See, e.g., American Federation of Government Employees v. Hoffman,* 543 F.2d 930, 940 (D.C.Cir.1976), *cert. denied,* 430 U.S. 965, 97 S.Ct. 1645, 52 L.Ed.2d 356 (1977). Congress explicitly expressed its intent that "military technicians have a mobilization assignment with the unit they support and be mobilized and deployed with that unit."[8] Alternatively and in addition, the mandatory retirement provisions have the beneficial effect of insuring promotional opportunities for younger employees. *See Simpson v. United States,* 467 F.Supp. 1122 (S.D.N.Y.1979).

In *Simpson,* the plaintiffs were National Guard technicians who were full-time civilian employees and officers in the New York Army National Guard. Plaintiffs were retired from their military positions pursuant to the Reserve Officer Personnel Act of 1954, and as a result subsequently lost their civilian positions. The *Simpson* court justified the retirements in that case in order "to insure that the military hierarchy does not become 'top heavy' while providing adequate promotional opportunities for qualified officers...." *Id.* at 1124. The court concluded that the "ADEA does not cover bona fide military personnel actions under the Reserve Officer Personnel

Act, *even when those actions affect the civilian employment of the otherwise covered individuals." Id.* at 1128 (emphasis supplied). *See also Costner v. Oklahoma Army National Guard,* 833 F.2d 905 (10th Cir.1987).

Thus, the regulation has a legitimate justification, utterly independent of age, both in strengthening the country's military apparatus and in facilitating the upward flow of personnel.

Finally, plaintiff's claim is weak because, even if the controversy were justiciable, he cannot make out a *prima facie* case of age discrimination under the four criteria set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Oliver v. Digital Equipment Corp.,* 846 F.2d 103 (1st Cir.1988). As one of the four *prima facie* prerequisites, plaintiff is required to show that he was qualified to perform the job he lost. As set forth above, plaintiff's loss of his position in the Air Force Reserve, and his consequent inability to follow his unit if it were activated, deprived him of an essential qualification for employment.

The second factor favors the plaintiff slightly, if at all. It is true he will suffer some economic damage through loss of pension benefits, as a result of the defendant's action. This sort of loss has been deprecated in various Circuit Court decisions. *See Helm,* 722 F.2d at 510 and *Costner,* 833 F.2d at 907–908. Even this loss might have been eliminated had plaintiff agreed to accept one of the four alternative positions offered to him.

The third and, as the First Circuit has stated, heavier factor, the type and degree of interference with the military function, weighs solidly in favor of the defendant. The lawsuit undermines military decision making at probably its most crucial point: maintenance of combat readiness. Plaintiff argues that the actual impact of the

---

**7.** In these circumstances, as the First Circuit has noted, the terms "non-justiciable" and "non-reviewable" are interchangeable. *Penagaricano,* 747 F.2d at 59, n. 5.

**8.** H.R.Rep. No. 97–333, 97th Cong., 1st Sess. 42 (1981).

plaintiff's lawsuit on the military is minimal, given the subsequent change in policy. This fact certainly assists the plaintiff on the question of *degree* of interference, but the type of interference still penetrates the heart of the military function.

The fourth factor, another to be weighed heavily, the extent to which exercise of military expertise or discretion is involved, is perhaps the most devastating for the plaintiff. Time and again, courts have afforded the executive utmost deference in the area of national defense and military affairs. *See Rostker v. Goldberg*, 453 U.S. 57, 66, 101 S.Ct. 2646, 2652, 69 L.Ed.2d 478 (1981).

> Courts traditionally have deferred to the "superior knowledge and expertise of professionals" in such matters as duty orders, promotions, demotions and retention decisions.

*Penagaricano*, 747 F.2d at 63, (*quoting Mindes*, 453 F.2d at 202). *See also Chappell v. Wallace*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983); *Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973).

The ART plan was introduced as part of the "total force" concept, that is, "to increase the combat readiness of the Air Force Reserve units, as well as their effectiveness in the event of mobilization." *American Federation of Government Employees*, 543 F.2d at 933. As has already been repeatedly stated, it is hard to imagine a facet of the military's role in which the expertise of professionals is more crucial or the stakes higher.

Plaintiff argues that, if permitted to take further discovery, he may be able to uncover evidence, for example, that civilian ART technicians are sometimes, in fact, deployed with their military units, or that irrational discrimination against older personnel infects the military. Such evidence, even if discovered, would be irrelevant. Even if it emerged that civilian employees sometimes accompanied military units, which seems highly unlikely in any significant crisis, this hardly undercuts a military decision to the effect that, on the whole, this arrangement should not be used across the board. As far as the existence of discriminatory sentiment within the military hierarchy, it is virtually axiomatic in ADEA cases that subjective malice is irrelevant where the legitimate justification is objectively supported.

In short, plaintiff's Fed.R.Civ.P. 56(f) argument is unpersuasive, since the discovery, even if successful, would not raise a *material* dispute. This complaint presents a non-justiciable military controversy, as a matter of law.[9]

## IV.  CONCLUSION.

For the foregoing reasons, this court hereby recommends that the defendant's Motion for Summary Judgment be ALLOWED.[10]

---

**9.** Class Action allegations do not save the complaint. The plaintiff may not press a class action raising issues for which he is not a legitimate class representative. *General Telephone Company of the Southwest v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Since plaintiff has no cause of action, he may assert none on behalf of a class.

**10.** The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection thereto with the Clerk of this court *within ten (10) days* of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See, U.S. v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir.1986); *U.S. v. Vega*, 678 F.2d 376, 378–79 (1st Cir.1982). *See also, Thomas v. Arn*, 474 U.S. 140, 154–55, 106 S.Ct. 466, ——, 88 L.Ed.2d 435 (1985).